## WILLIAMS v. STATE.

### [In Banc. No. 20676.]

1. HOMICIDE. *Self-defense a question for the jury.*
   On a trial for homicide, evidence *held* to make a question for the jury as to impending danger at the time of the killing.

2. CRIMINAL LAW. *Reference by prosecuting attorney to mobs and mob law in trial of negro held improper.*
   On the trial of a negro for killing a white man, it was improper for the prosecuting attorney in his argument to remark that it was to the credit of the good citizen of A. that they permitted defendant to have a fair trial in court rather than take their vengeance at the hands of an angry mob.

3. HOMICIDE. *Killing of deputy sheriff in resisting unlawful act constituted manslaughter.*
   Under Code 1906, section 1237 (Hemingway's Code, Section 967), making every person unnecessarily killing another, while resisting an attempt by such other person to commit any felony or do any unlawful act, guilty of manslaughter, where deputy sheriffs, after arresting a negro, instead of taking him to jail or proceeding to charge him with a violation of the law, whipped him to make him tell what he had done with a pistol, and, while proceeding with him to the place where he said the pistol was,

one of them was shot and killed by him, the offense was manslaughter as a matter of law, as their unlawful acts were still continuing at the time of the killing.

4. HOMICIDE. *Killing in resisting unlawful act not murder, though malicious.*

    Code 1906, section 1237 (Hemingway's Code, section 967), making an unnecessary killing while resisting an attempt to commit a felony or do an unlawful act manslaughter, necessarily implies an intentional killing, and malice not pre-existing does not render the killing murder.

SYKES, J. AND SMITH, C. F., dissenting.

APPEAL from circuit court, Washington County.
HON. H. H. ELMORE, Judge.

Anthony Williams was convicted of murder, and he appeals. Reversed and remanded on suggestion of error.

*A. H. Turnage,* for appellant.

We contend that the defendant is either guilty of manslaughter or he is guilty of nothing. If he shot and killed the deceased in self-defense then he is guilty of nothing. If he shot the deceased while his blood was hot and before he had had time to cool because of the whipping he had been submitted to, then he is guilty of manslaughter. If he shot and killed the deceased in the purview of section 1237, Code 1906, then he is guilty of manslaughter.

Section 1237, Code 1906, reads: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."

Here deceased, and both these two negro witnesses Lucius Blevin and Mat Williams, and also Mr. Tommie Williams, the principal state's witness, had, just prior to the killing been inflicting upon the defendant a "horse

whipping," having at the time pistols in their possession, and certainly with the intent of intimidating the defendant and to prevent him from defending himself. There can be no doubt of this, and certainly no reasonable court can question it.

Section 1044, Code, 1906, reads: "If any person assault and beat another, with a cow-hide, whip, or stick, having at the time a pistol, or any other deadly weapon in his possession, with intent to intimidate the person assaulted, and prevent him from defending himself he shall, on conviction, be imprisoned in the penitentiary not longer than ten years."

This last section then makes it manifest that the deceased and his confederates had been, just a few minutes prior to the killing, committing a felony, and from all physical facts and indications were about to commit it again. See *Long* v. *State*, 52 Miss. 23, where the court used this language: ". . . If it occurred after the lapse of any considerable time, it would seem impossible to divest it of the element of malice. Thus construed the statute amounts to this: If I see another engaged in the commission of an offense against the criminal laws and I resist the accomplishment, and in such resistance slay the person so engaged, my crime will be manslaughter and not murder, even though the act of killing was unnecessary to defeat his act; and the same result will follow where the killing ensues instantly after the abandonment by him of his attempt. Because I am engaged, or had just been engaged, in resisting the doing, by him, of an unlawful act, the law will, to some extent, throw the mantle of charity over the necessary slaughter committed by me, by reducing my offense from murder to manslaughter. It amounts to a legal imputation of heat of blood for my benefit, whether in point of fact the jury should believe that there was such or not."

It appears that all these parties had walked al out
three hundred or four hundred yards from the place
where the whipping had been inflicted to where the kill-
ing occurred.  This must have required not more than
ten minutes, or that is to say the killing occurred within
ten or fifteen minutes from the time defendant had been
whipped by deceased and his confederates.  Had suffi-
cient time passed for the blood to cool?  We most re-
spectfully urge that the blood was even hotter at the
time of the killing than it was during the infliction of the
whipping.  21 Cyc., page 736; *McDonald* v. *State,* 29
So. 171; *Smith* v. *State,* 58 Miss. 867; *Preston* v. *State,*
25 Miss. 383, 1 S. & M. 381.

The court should have given a more definite, explicit
and full instruction on the crime of manslaughter, de-
fining the crime, telling the punishment, and. exactly
what constituted it.  See *May* v. *State,* 42 So. 164, and
*Johnson* v. *State,* 23 So. 579.  In this last case the court
said:  "A more unsatisfactory case on the testimony
was, perhaps, never presented to an appellate tribunal.
There was not a charge given on either side as to man-
slaughter, and yet, on the proof, we think there might
have been, properly a verdict of manslaughter.  We do
not mean to say that a verdict of murder would be im-
proper, on the testimony, if there had been no error of
law. But since a verdict of manslaughter might also be
upheld, it was, in the distressingly conflicting state of
the evidence, to the last degree important that no error
of law should have been committed.  It is true that in-
struction No. 4 given for the defendant attempted to be
an instruction on manslaughter, but that instruction by
itself alone, is too narrow, for it did not define man-
slaughter, and did not tell what the punishment could
be, and was therefore deficient in failing to properly
define it.  Instruction No. 5 given for the state shut the
jury up to find a verdict either for murder or for noth-
ing.  If the state argues that we cannot complain of the

failure of the court to give an instruction on manslaughter when we did not ask for it, we refer your attention to *May v. State, supra.*

The court should not have given instruction No. 1 for the state at all, but if such an instruction had been proper, it should have been modified by carrying with it a clause on manslaughter. There was absolutely no evidence to support instruction No. 1 for the state. By it the court simply told the jury to find the defendant guilty as charged in the indictment, if it believed him to be guilty. He could have been guilty and still not guilty as charged. See *Johnson* v. *State, supra.* The evidence here so manifestly fails to support a verdict of murder that the court should have been very particular in giving an explicit instruction on manslaughter for that is certainly the very worst verdict the evidence will sustain.

And finally we come to the argument of the county attorney when he used the following language: "Be it said to the eternal credit of the good citizens of Arcola that they have permitted this defendant to have a fair trial here in a court of justice rather than taking their vengeance at the hands of an angry mob."

This language was admitted by the said attorney as having been used by him. (See his testimony, pages 67 to 71 of the transcript.) On the motion for new trial we insisted that he prolonged his argument on this line for several minutes, but we were promptly met by a stout denial from the said attorney, and his position being backed by the trial court, we will, of course have to say that we were wrong. But it seems strange that this sentence would have been dropped, as by chance, right in the midst of an argument. If it were dropped in such a manner what were the jury to infer from it? Mr. Toombs is reputed to be an able prosecutor, a fair lawyer in every way, and none can vouch stronger for his reputation being accurate than we can. But we do

respectfully submit that to have dropped it in the midst
of an argument to which it had no reference whatever
strikes us as somewhat peculiar. There is no doubt that
it struck the jury in a similar way. There certainly can
be no doubt that it made some impression on the jury,
just what, how can we even surmise. There is but little
question that some member, at least, of the jury heard
it, especially after the defendant had called the court's
attention to it and had requested the court to stop that
line of argument and the court saying it did not con-
sider such remarks improper. Then what impression
did all that make on the jury? Who can tell? I, submit
that it did make an impression, and that to say the very
least of it, that impression was not for the good of the
defendant. If it made an unfavorable impression, or
if there is a reasonable doubt that it did make an un-
favorable impression, then that doubt should be re-
solved in favor of this defendant and he should be
granted another trial, where there may yet be an abso-
lute and fair and impartial trial without any inferences
being cast into the scales against him.

In the case of *Collins* v. *State,* 56 So. 527, the court
said in speaking of improper remarks by attorneys:
"The ordinary average juror is easily influenced by a
statement to the effect that the people of a community
both white and black, employ one to prosecute. The
very fact that this is done is the highest evidence that
the community desires the party convicted. There is
nothing so potential in influencing men as public senti-
ment. Very few people have moral courage and back-
bone either to oppose or to resist it. It is true saying
that the voice of the people is the voice of God. "*Vox
populi, vox, Dei.*" Can any one say under the circum-
stances the defendant had that which the constitution
guarantees to every man, a fair and impartial trial?
The appellant is a negro, yet he is entitled to be tried
by the same rules of law, and he must receive, while

upon trial for his life, the same treatment as other persons. Common justice and common honesty cry aloud against the treatment shown by this record. *Richburger* v. *State*, 44 So. 772. We submit that the language used in this trial was practically the same as used in the reported case. In 4 Ann. Cas., page 844, note, will be found a full discussion.

I refer the court to the following citations: 64 Mo. 367, 27 S. W. 133; 78 Ala. 436; 73 Ala. 57, 47 S. W. 1058; 42 L. R. A. 774; 22 So. 748 and 262; 49 Ind. 33; 59 Miss. 250, 22 S. E. 546, 10 So. 509; 32 Ark. 585; 29 Ark. 225; 15 So. 264; 11 So. 255; 37 So. 330; 47 So. 794; 29 So. 844; 30 Cal. 312, 15 So. 82, 49 S. W. 1085; 71 Amer. St. Rep. 594; 77 S. W. 183; 18 So. 199; 1 So. 707; 37 Miss. 327; 55 Miss. 403; 54 So. 208; 17 So. 380; 31 So. 105; 13 So. 898; — So. 354; 32 So. 704; 27 So. 880; 30 So. 39; 25 So. 671; 19 So. 712; 37 So. 93; 32 So. 141; 25 So. 529; 12 So. 419; 10 So. 657; 55 Miss. 436 and 414; 44 Miss. 762; 13 So. 677; 78 So. 182; 76 So. 625; 74 So. 679; 73 So. 791; 71 So. 738; 55 Miss. 424; 54 Miss. 430; 47 Miss. 581; 47 Miss. 318, 50 So. 626; 25 Mich. 405; 34 E. C. L. 670; 4 Ky. L. Rep. 3; 11 Ann. Cas., page 1181, and note.

In conclusion we desire to quote from the late J. A. P. CAMPBELL in *Lamar* v. *State*, 2 So. 12, where he said: "The suggestion is made that the effect of the proceeding was merely to impress on the jury a sense of duty; and as it lead to a correct result, no harm was done. To inform a jury that an armed mob was about determined to take the life of a prisoner, or any juror who stood in the way of his conviction, might have a persuading influence in producing a proper verdict, but all would unite in condemning it as a travesty on judicial proceedings." We submit that the statement made by the county attorney to which we objected and prepared a special bill of exceptions was equally as strong as this

statement which was condemned by this court. The question is not, did the argument have or not have any improper influence on the jury, but it is what bearing might it have had? We submit that this entire record is full of errors, and respectfully submit that the verdict should be reversed and the defendant granted a new trial.

*Ross Collins* and *Percy M. Lee,* for appellee.

The first contention advanced by counsel for appellant in his brief is that the appellant can be guilty only of manslaughter, if of anything at all. In this connection he cites, section 1237, Code of 1906, which reads as follows: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."

He also takes the position that in the purview of section 1044, Code of 1906, the act of Mr. Tommie Williams in striking the appellant two blows with a tissue paper belt constituted a felony. Now, we submit that this act does not come within the purview of said statute, for said section says: "If any person assault and beat another with a cowhide, whip or stick." Surely a little tissue paper belt cannot be considered a cowhide nor a whip nor a stick, and we submit that no such construction can be imputed thereto.

Counsel for appellant cites the case of *Long* v. *The State,* 52 Miss. 23, with an excerpt from the opinion on page 40, in which he would attempt to show that the appellant can be guilty of nothing more than manslaughter, if anything at all. We submit that counsel's argument is not sound and, therefore call the attention of the court to a subsequent excerpt from the same opinion on page 40 thereof: "The party slaying, however,

cannot take shelter under it (referring to section 1237, Code of 1906) if the jury should be of opinion that there was actual malice."

The court further said: "There was, therefore, no error in the refusal to grant the 12th instruction asked by defendant below."

This instruction was as follows: "The court further instructs that even if the jury should believe from the evidence that the accused unnecessarily killed the deceased, after an attempt on the part of Bailey to commit an unlawful act upon the accused had failed, then such killing is not murder, but manslaughter."

This case, therefore, offers very poor consolation to the appellant here and we submit that the proposition which he seeks to advance here cannot be maintained under this authority. If the jury believed that Williams bore actual malice, and, as I take it, they did from the verdict, then this court will not disturb or question same.

Counsel also cites the case of *Smith* v. *State,* 58 Miss. 867. The case cited is not in point, for in that case the court said: "To reduce a homicide from the grade of murder to manslaughter, the killing must not only be done in the heat of passion, but the provocation must be sufficient to negative the inference of malice." Neither of these elements appear in this case.

The case of *Preston* v. *State,* 25 Miss. 383, cited by counsel for appellant, is not in point, for in that case the court held that a man may be subjected to great indignities and be greatly provoked and still not stand acquitted of murder if he should instantly slay his aggressor.

21 Cyc. 736, has no application at all because all the evidence shows that there was no sudden heat of passion due to adequate provocation, but that, on the other hand, it was done through malice.

The *Strickland case,* 23 So. 921, cited by counsel for appellant, is not in point, for in that case no instruction on manslaughter was given, when this should have been done. In the case at bar, an instruction on manslaughter was asked for by the appellant and given by the court.

Counsel for appellant argues that the instruction on manslaughter was not sufficient and he claims that it did not express the law on manslaughter fully. In support of this contention he cites the cases of *May* v. *State,* 42 So. 164 and *Johnson* v. *State,* 23 So. 579. These cases are not in point for there, no instruction at all on manslaughter was given when that kind of a verdict might have been reasonably returned. In the case at bar an instruction on manslaughter, which correctly announced the law was given. This instruction being No. 4 for the defendant.

Counsel for appellant contends that instruction No. 1 for the state was erroneous. But this instruction correctly announces the law that if the jury believe from the evidence beyond all reasonable doubt that the defendant was guilty as charged in the indictment, then they could return either of the verdicts to which their attention was directed. Now, the appellant was charged in the indictment with murder and if the jury believed that he was guilty as charged, no verdict, other than those verdicts to which the jury's attention was called, could have been returned.

In the case of *Schubert* v. *State,* 66 Miss. 451, the court said: "The defendant cannot complain of the failure of the court to define manslaughter as he did not seek to obtain any definition of it."

Counsel for appellant directs the attention of the court to a part of the argument of the county attorney and claims that the appellant was greatly prejudiced by the attorney's using the following language: "Be it said to the eternal credit of the good citizens of Arcola that they have permitted this defendant to have a

fair trial here in a court of justice rather than taking their vengeance at the hands of an angry mob."

We find ourselves at a loss to see where a statement of this kind works injury to the appellant. It occurs to us that the county attorney was seeking simply to pay the citizens of Arcola a compliment rather than to jeopardize the appellant's defense. It does not seem that any other intent could be imputed to this statement, but on the other hand, it appears that it must be regarded simply as a complimentary term and in; this connection brings to mind a joke on the delta we heard some time since; Two negroes were talking one day and Sambo said to Jerry:

"Did you hear about that nigger committin' suicide up in the delta?"

"No, why wuz it?" asked Jerry, to which Sambo replied: "He called a white man a liar."

We, therefore, submit that this language was intended purely as a compliment to the good citizenship of Arcola, and in view of the fact that many persons have been mobbed in this state because they committed crimes that did not savor so much of murder as this one and in view of a rather too common practice of lynch law, we think that the compliment was a deserving one and that the language was not calculated in any way, nor are we able to see how it did, prejudice the appellant's case or deprive him of any rights.

The *Collins case,* in 56 So. 527, cited by counsel for appellant is not a parallel with the case at bar, for in that case the court said that the prosecuting attorney's argument constituted an appeal to race prejudice and to a popular clamor. The attorney, after making arguments calculated to stir up race prejudice, told the jury that, the only way you can break up this pistol-toting among these niggers is to have a neck-tie party." This statement might have been calculated to arouse the public state of mind to the point of mob violence and it was therefore wholly unwarranted and very likely resulted

in prejudice to the defendant. In the case at bar no reference that would result in race prejudice was indulged and instead of fomenting the mob spirit the county attorney's address was a condemnation of same and a compliment to the citizenship of Arcola for so regarding it by their conduct.

The case of *Richburger* v. *State,* 44 So. 772, is not in point at all. The case of *Hampton* v. *State,* 40 So. 545, cited by counsel is not applicable for in that case the district attorney indulged in a sporadic outburst of violent denunciation of mulattoes, of which class of negroes the defendant was a member. No attempt was made by the prosecution in this case to stir up race prejudice.

The case of *Lamar* v. *State,* 2 So. 14, cited by counsel, cannot be in point for in that case the jury was informed that an armed mob was about determined to take the life of the prisoner. Of course, statements of that kind used by officers in the prosecution are entirely improper, very prejudicial to the defendant and amount to reversible error, but the language used by the county attorney in this case was not calculated to prejudice the appellant and, in fact, it could not have done so.

We have recited no authorities other than those referred to by counsel for appellant, but upon consideration of these cases, we feel that they are wholly in point so far as the state's side of this case is concerned, and they are entirely conclusive. We could likewise call the attention of the court to dozens of other cases that completely overwhelm the appellant's position but our consideration for the court intervenes. There is really nothing in the record to contend about seriously. The facts are conclusive and overwhelming and show beyond doubt, if human testimony is to be believed, that the appellant is a murderer; the instructions given for the state are a correct pronouncement of the law, and we do not see how it could be possible for the appellant to complain of in-

structions in view of those which he received for they were unusually liberal. From the record it manifestly appears that the appellant received a fair and impartial trial and since he was convicted by a jury of good and lawful men, under proper instructions, and has received the benefit of all rights guaranteed to him under the constitution, we, therefore ask that the judgment of the trial court be affirmed.

PER CURIAM.

This is an appeal from a conviction for murder followed by a death sentence.

On the occasion in question, some sort of a show was being given in the town of Arcola with its accompanying crap game, in which game the appellant and Lucius Blevin, among others, were engaged. A controversy arose during the progress of the game between the appellant and Blevin, which Blevin, shortly after reported to the deceased and Tom Williams, both of whom were deputy sheriffs, stating that the appellant had threatened him with a pistol. The deceased thereupon took the appellant into custody, and was joined shortly thereafter by the other deputy, Tom Williams. What then occurred, according to the state's theory, will be best told in the language of Williams, who testified on behalf of the state:

"Q. When you saw him next, he was under arrest with Mr. R. L. Williams, the dead man? A. Yes, sir.

"Q. Where was he when you saw him there? A. Out there back of a boarding house, down there at Arcola.

"Q. What was Mr. Williams doing with him? A. Mr. Williams was setting down on an old safe there, and the negro was standing out in front of him.

"Q. What did you do—go up where they were? A. Yes, sir.

"Q. Go ahead and tell what occurred from then on? A. Mr. Williams told me: 'Tom, this negro had a pistol

here, and he has thrown it away. Let's look for it. Hold him here until I look for the pistol.' And I said: 'All right. He is just lying though. He has it around here somewhere himself.' This negro said, 'I sent it home by my brother-in-law.' I told Mr. Williams he was lying; that he hadn't sent it anywhere. He looked around under the house a few minutes and couldn't find it, and I said: 'Well, he said he had it. That is sufficient, and he has been toting it around.' He said, 'If we get the pistol that will be better.' Then he said, 'We will take him on over there to the house,' and the negro said, 'I have my horse here, Mr. Williams,' and Mr. Williams said, 'Get the horse, Lucius,' and this negro, Mat Thomas, I told him to come too. We went across the railroad three hundred or four hundred yards from where we started from, and he run his hand down in here (indicating), and said his drawers were down. I noticed him by the light from the railroad. We could see by that. It was dark there where we had been. The first thing I knew then he put the gun up to my cheek and shot me like that (indicating), and shot Mr. Williams in the side. I turned around and pulled my gun and made one shot. The first shot I shot in the ground right by him, and the next shot I made he ran off and shot at me twice. I asked Lucius for more shells, and he said. 'No, sir. . . . '

"O. Who is Lucius? A. Lucius Blevin, a state witness. He said. 'No. sir; I haven't got any shells.' He loaded up the second time and came back, and the second shot he run up behind me as I was crossing the railroad and shot me through the hand, and then shot me through the thumb, and Lucius said. 'Mr. Tom. please come on, that nigger's going to kill you,' and caught ahold of me, and I said, 'Turn me aloose.' and I went up to the section house and told Mr. Tom about it."

On cross-examination this witness further testified that while they were back of the boarding house, and while the appellant was held by Mat Williams and Lucius

Blevin, he was struck, but twice only, with the buckle end of a trousers belt, and with nothing else, in order to make him tell where his pistol was.

The appellant's evidence was in sharp conflict with that of the state's witnesses, and, if true, fully supported his claim that he killed the deceased in self-defense.  His theory of the case is contained in the following questions and answers which appear in the transcript of his evidence in chief:

"Q. Go ahead and tell the jury all about that; they are going to decide whether you will be hung or not.  A. Yes, sir; I will tell them the truth and nothing but the truth. Well, the way it was, from the first beginning, it started about a dollar and a quarter.  Albert Kimberly put $1.25 down, and Lucius picked it up.  Mat said, 'I shoot a dollar and a quarter.'  He said: 'No, I don't shoot it; I put the money down there.'  And he looked around and said, 'Who got my money?'  The boy said: 'I ain't got it; you ain't put any down there.'  The boy asked me didn't he put it down there, and I said: 'Yes, he put it down, two solid halves and a quarter.  I reckon he did.'  Lucius that time run around to grab me to cut me, and another fellow run in betwixt us, and said, 'No, I wouldn't do anything like that,' and by that time I went out and got a brick, and he said I drawed a pistol on him.  I didn't do that.  Time I got out the house Mat come up and said, 'Boys, I wouldn't have any trouble.'  I said, 'I ain't doing nothing, no use for me to let them run over me.'  I had a brick in my hand then and never pulled a pistol, at all.  After that I went around on the front part where the show was and went back in the gambling house.  That time Mat was up in the box cutting off the game, and finally Mr. Tom came in and Mat gets down and gives somebody else his game. Then after he stood around awhile Mr. Tom went to the door and got to whispering around, and Mr. Tom left then. I don't know where he went.  I suspicioned then—

"Q. What Tom was that? A. Mr. Tom Mosely. After I heard that whispering and all going on, I said, 'Well, that fellow has told him I had a pistol or something.' That time I goes out then and hides this gun, and time I goes and hides the gun I went back where the boys gambling, standing up in there. After awhile I went back out the door again, and Mr. Williams was standing out there, and he walked up to me.

"Q. Which Williams was that? A. Mr. R. L. Williams. He came up to me and said, 'Where is the gun at?' I said, 'I haven't any,' and he searched me and didn't find any. He found a scabbard on me, and said, 'Where that gun at, nigger?' I said, 'I haven't got any gun. I sent it home by my brother-in-law,' that very way. So I walks on off, and he said, 'I told you to stand here, not move any more.' I said, 'All right, Cap,' and that time Mr. Williams sent for Mr. Tom, and I said, 'I am going to stand here and won't move any more.' That time Mr. Tom came up and ousted his gun and puts it in my face. I said: 'That's all right, white folks; I haven't got a pistol.' He curses me and says, 'You son of a bitch! You get it.' I said, 'I haven't got any gun.' He says, 'Boys, get him.' He said to me, 'Come around here,' and I went around there, and he called Mat and Lucius, and they carried me up there to the gin and taken me out there and made me pull my clothes off, and I begged them not to whip me and I would tell them where the gun. He said, No, you don't know where it is at.' And they stretched me out, one on my head and one on my feet. Mr. Tom grabbed his gun and hit me once on this side and once on this side (indicating). Mr. Tom grabbed the belt and hit me two licks and the buckle broke off then, and Mr. R. L. Williams said, 'Go in there and get a gin belt.' He said, 'No, I can't get in there,' and that time Mr. Tom walks up and kicks me here on my mouth. My mouth commenced to bleeding all down here, and

I said, 'Let me up, and I will go and get the gun.'
They let me up then, and I put my clothes back on me.
Blood was running down my face, and I said, 'Let me
go get my horse,' and they told me go get your horse,
and I said, 'All right,. sir.' I went down there, and
they wouldn't let me get the horse. Mr. Williams had
a flashlight and looked all under the house where the
boys was gambling, and he couldn't find it and searched
my horse and couldn't find it, and he said, 'That nig-
ger's got that gun, let's go carry him back to the gin,'
and told me to get in front. I said: 'I will get it.
Don't kill me.' He said, 'I will kill you if you don't.
I said, 'Lordy, if I don't get it I am killed, and if I
do get it I am killed.' Mr. Tom was on the side of me.
Mr. Williams was in front of me about as far as from
here to Mr. Boddie, and this Mat was behind me, and Mr.
Tom on the side of me, and this Lucius in front of me
like the gentleman sitting there, and he was leading the
horse, and I said, 'Lord, horse, you about to walk over
me,' and Mr. Williams said, 'She don't know you to-
night, does she?' I said, 'No, sir; she don't know
me.'

"Go on and tell it all. A. So that time Mr. Tom
shot off, and that time I started to break to run. I
says: 'No, don't run. If you do, he will kill you.' One
mind said, 'Get your gun,' and that time I eased up to
my. horse and got my gun from under the pummel of
the saddle on my horse, and they makes a shot and I
breaks to run, and I runs off in the weeds, and they
makes four or five shots at me, and I was running, and
I made three shots and run off in the weeds then. They
shot me here (indicating)', and shot me there (indicat-
ing). That is all.

"Q. Didn't you go back up there and shoot them some
more? A. No, sir; I did not."

Section 1237, Code of 1906 (1 Hemingway's Code, sec-
tion 967), provides that: "Every person who shall unnec-

essarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."

Judges ETHRIDGE, HOLDEN, and STEVENS are of the opinion that the appellant's contention that under this statute his conviction should have been limited to manslaughter should be sustained, and the judgment of the lower court reversed; their reasons therefor being set forth in a separate opinion.

Judges SYKES, COOK, and SMITH are of the opinion that on the evidence it was for the jury to say whether the appellant killed the deceased in the *bona-fide* resistance of an attempt by the deceased to do an unlawful act, viz. to force him by the use of unlawful means to deliver up his pistol, or whether he killed the deceased, not in order to prevent the commission of the unlawful act, but because of malice engendered in him by the treatment he had just prior thereto received, and was still receiving at the hands of the deceased; that if the appellant killed the deceased because of malice so engendered, and not in order to prevent the commission of the unlawful act, as the jury evidently believed, he is guilty of murder, and cite in support thereof *Long* v. *State,* 52 Miss. 23; *McMaster* v. *State,* 29 So. 522; *Brown* v. *State,* 98 Miss. 786, 54 So. 305, 34 L. R. A. (N. S.) 811.

We find no reversible error at all in the other rulings of the trial judge of which complaint is made.

Affirmed, and Friday, the 29th day of August, 1919, fixed as the day for the execution of the sentence.

*Affirmed.*

HOLDEN, J. I think the judgment of the lower court should be reversed because under the statutes, sections 1237 and 1044, Code of 1906, sections 967 and 772, Hemingway's Code, the crime committed was manslaughter only.

The facts of this deplorable tragedy as shown by the record may be briefly stated as follows: A controversy arose between the appellant, Anthony Williams, and another negro by the name of Lucius Blevin while they and other negroes were engaged in a crap game. Blevin testified that the appellant drew a pistol on him during the difficulty, whereupon he (Blevin) reported the matter to Mr. R. L. Williams, deputy sheriff there at the village of Arcola. The deputy sheriff, R. L. Wiliiams, thereupon arrested and searched the appellant, and, failing to find a pistol on him, sent for Mr. Tom Williams, another deputy sheriff, and the two white deputies, accompained by the said Lucius Blevin and another negro by the name of Mat Williams, took the appellant with them "over the creek" back of the gin, where it appears, from the testimony of the state's witnesses as well as the testimony of the appellant, that Mr. Tom Williams, who was then and there acting as a deputy sheriff, proceeded to administer unto the appellant a whipping, using a belt for the purpose, while the two negroes, Blevin and Williams, held the appellant down, one on his head and one on his feet. After having hit the appellant several licks with the buckle end of the belt, which Mr. Tom Williams says was a paper belt, the belt broke; and at this juncture appellant agreed to go and get the pistol if they would let him up.

It is conclusively shown by the state's testimony that the whipping of the appellant in the manner set out was for the purpose of making him disclose the whereabouts of his pistol. The two deputies and the two negroes let the appellant up and went with him toward the house of his brother-in-law where he had stated the pistol was located while he was being whipped upon the ground. After all of the parties had proceeded about three hundred or four hundred yards from the place where the whipping had been administered, there was some brief conversation

between the parties, as it appears, regarding a show that was in the village of Arcola. The deputies were armed with pistols, and, as they proceeded toward the place where the appellant stated he had left the pistol, the appellant stopped and claimed that his underwear was coming down, reached his hand somewhere in his clothes, and drew a pistol and commenced to shoot, first at Mr. Tom Williams, wounding him, and then shot and killed Mr. R. L. Williams. Mr. Tom Williams then shot and wounded the appellant in three places.

The above statement of the case is based upon the testimony introduced by the state. The testimony introduced by the appellant was disbelieved and disregarded by the jury as it had the authority to do, and therefore is not to be considered as part of the proof in reviewing and discussing this appeal. The facts of the case are limited here to the proof introduced by the state.

Among the errors assigned by the appellant for reversal are: First, the verdict of the jury is contrary to the overwhelming weight of the evidence showing that the appellant acted in necessary self-defense to save his own life or prevent great bodily harm, the danger of which was then impending; second, that taking the testimony offered by the state as a whole, the appellant would be guilty only of manslaughter, if guilty of any offense; third, that the argument to the jury by the prosecuting attorney with reference to mob law was erroneously permitted by the court to the injury and prejudice of the appellant's rights at the trial.

The state contends that no error was committed in the trial court, and that, even though the appellant had been whipped and was unlawfully mistreated by the deceased and the others in the crowd, still appellant was guilty of murder because he shot and killed the deceased, the deputy sheriff Mr. R. L. Williams, at a time when he was in no imminent danger of losing his own life or suffering

great bodily harm at the hands of the deceased or any
other person, and that such killing was unnecessary and
was done with malice aforethought.

The first contention of appellant that he was acting
in self-defense when he shot the deceased because of the
unlawful whipping he had received, and which he expected
would be repeated upon him again in a few minutes, as
soon as the deceased and the other parties had discovered
the lie he had told as to the location of the pistol in order
to be let up from the ground, and that he reasonably
anticipated this impending danger, and that he was not
required by law to wait until he was in a situation where
he could not defend himself against such treatment, is, I
think, untenable because the question of iimpending
danger at the time of the shooting by the appellant was
one for the determination of the jury, and the jury de-
cided this issue against the appellant.

The complaint of the appellant as to the remarks and
language used by the prosecuting attorney in his argu-
ment to the jury deserves notice. In his argument the
prosecuting attorney said to the jury:

"Be it said to the eternal credit of the good citizens of
Arcola that they permitted this defendant to have a fair
trial here in a court of justice, rather than take their
vengeance at the hands of an angry mob."

I disapprove of this character of argument to the jury,
and wish to respectfully announce again that prosecuting
attorneys should refrain from referring to mobs or mob
law in the trial of a human being in a court of justice. The
inferences calculated to be drawn from such comment by
prosecuting attorneys are likely to be prejudicial to the
rights of the accused in securing a fair and impartial trial
of his case. I think it was error in the court to permit
the prosecutng attorney to use the language complained
of in the argument of the case before the jury. However,
it is unnecessary to discuss whether or not this error

would cause a reversal if there was no other reversible error in the case.

The point advanced by counsel for appellant that the evidence introduced by the state does not warrant a conviction of murder, but at best would only justify a conviction of manslaughter, is based principally upon our statutes, sections 1044 and 1237, Code of 1906, sections 772 and 967, Hemingway's Code, which read as follows:

"Sec. 1044. If any person assault and beat another with a cowhide, whip, or stick, having at the time in his possession a pistol or other deadly weapon, with intent to intimidate the person assaulted, and prevent him from defending himself, he shall, on conviction, be imprisoned in the penitentiary not longer than ten years."

· "Sec. 1237. Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."

The case presented by the state, and as shown particularly by the testimony of Mr. Tom Williams, one of the deputies who was shot by the appellant, substantially shows that the two armed deputies, one of whom was killed, together with the two negro men, searched the appellant to find his pistol, and, failing in this, they then took him across "the creek," and while the two negro men held him down one of the deputies proceeded to whip him for the purpose of making him tell what he had done with the pistol. In order to be relieved from the pain of this unlawful chastisement, the appellant told the officers a lie as to where the pistol was located and offered to go with them to get it. They let him up and proceeded with him under unlawful duress in the mission of getting the pistol, and before they reached the place to which they had started the shooting took place and one of the deputies, Mr. Robert Williams, was killed.

The defendant testified that he was kicked in the face, whipped with the strap, and beat with a pistol. The jury did not believe him; consequently, I discard his statement as to those things. But I do know from this record as testified to by the state's witnesses that these two deputies, without any warrant for arrest or seizure and search, arrested the appellant, searched him, and proceeded to extort from him by corporal punishment the whereabouts of the pistol to be used as incriminating evidence against him. The appellant made no resistance to the arrest or search. The deputies, acting under the badge of the law, did not then take the prisoner to jail or proceed to charge him in an orderly way with violation of the law, but proceeded and continued to carry out the assault and unlawful mission of compelling the disclosure of the weapon. It was the duty of these officers to not only refrain from subjecting their prisoner to violence, but it was their legal and moral duty to protect the appellant while in their custody from such unlawful assault. They failed not only in their duty, but this record shows that they actually participated in the unlawful violence to their prisoner. With reference to the unlawful assault and whipping of appellant, the Attorney General says in his brief that: "It may perhaps be an effective method to acquire information, but at the same time it must receive the condemnation of the courts of law and justice."

That these officers were in danger from the concealed pistol in the clothes of the appellant is quite true, but it must be remembered that the perilous situation was brought about entirely by the deceased and his associates. The conduct and proceedings of the two white deputies and their two negro assistants were unlawful from the beginning of the whipping until the time of the fatal shooting. Therefore I think the case comes within section 1237 above referred to, and that the contention made by the appellant that this homicide can only be manslaughter is well taken and should be sustained.

It is urged by the state that the question as to whether or not the appellant was guilty of murder was a question properly submitted for the determination of the jury; that it was a question of fact as to whether the appellant shot the deceased with malice aforethought at a time when unnecessary to do so, and after an interval of cooling time between the whipping and the shooting in which the appellant formed the premeditated de-sign to kill the deceased. I think this contention by the state is unsound, in view of the statute and the uncontroverted facts of the case. Under section 1237, the killing is declared to be manslaughter if unnecessarily done while resisting the attempt to do an unlawful act or immediately after such attempt had failed. The appellant fired the fatal shot in this case while the deceased was still in the actual commission of the unlawful act commenced by the unlawful assault and whipping, and continued by compelling appellant to go with the parties and produce the self-incriminating pistol. If the attempt or commission of the unlawful act by the deceased had failed or had been abandoned, and any considerable length of time had elapsed thereafter before the killing occurred, then in that case the jury, and not the court, should determine the question of whether the killing was done with malice aforethought. But where, as in this case, the attempt and actual commission of the unlawful act by the deceased was resisted by the slayer, without actual malice previously formed, and such resistance resulted in the death of such offending person, it is only manslaughter under the statute, and was a matter of law for the court to pass upon as to malice and not a question of fact for the jury. *Long* v. *State*, 52 Miss. 23.

The appellant, it appears from this whole record, had no malice or ill feeling toward the deceased prior to the whipping. They were strangers to each other, and the motive for the shooting was the unlawful treatment im-

posed upon appellant which continued in connection
with and as part and parcel of the unlawful assault and
whipping by the deceased, until the fatal shot was fired.
The provocation was sufficient, as a matter of law and
fact, to negative the inference of previous malice on the
part of appellant. Evidently the appellant was merely
resisting the unlawful acts of the deceased in an effort
to free himself from the illegal imposition and further
prospective bodily punishment. If he had shot and
killed the deceased at the time he was being whipped
on the ground, no one would hardly contend it was mur-
der; but it appears that he did not shoot at that time,
as he was overpowered and covered by his assailants,
but he did resist in the only effective manner apparent
to him as soon thereafter as possible. He made no re-
sistance to his search by the officers. He was whipped
solely because he refused to furnish the incriminating
evidence against himself. The deceased and his asso-
ciates did not abandon their unlawful purpose after
they had whipped appellant, but continued to pursue it
by further intimidating and forcing appellant to go
with them for the pistol. While thus engaged in this
unlawful mission, the deceased was killed. There was
no interval of time between the whipping and shooting
in which the hot blood caused by the unlawful provoca-
tion could cool. The walk from the place of the whip-
ping to the place of the shooting occupied but a few
minutes, and, regardless of what was said about "a
show in Arcola," the heat of passion and anger was
still in the breast of appellant from the whipping and
continued unlawful treatment. Under these facts and
circumstances, I think we would be warranted in hold-
ing that as a matter of law the killing was no more than
manslaughter.

In *Long* v. *State,* 52 Miss. 23, in considering the in-
tent and purpose of section 1237, the court, speaking
through Justice CHALMERS, said:

"We must think that the 'unlawful act' spoken of means a crime or misdemeanor. The language is 'to commit a felony, or to do some other unlawful act.' The unlawful act, we think, must be of a criminal nature, even though inferior to felony. We think, further, that the killing must take place either during the actual resistance to the unlawful act, or immediately following its defeat and abandoment. If it occurred after the lapse of any considerable period, it would seem impossible to divest it of the element of malice. Thus construed, the statute amounts to this: If I see another engaged in the commission of an offense against the criminal laws and I resist its accomplishment, and in such resistance slay the person so engaged, my crime will be manslaughter and not murder, even though the act of killing was unnecessary to the defeat of his act; and the same result will follow where the killing ensues instantly after the abandonment by him of his attempt. Because I was engaged, or had just been engaged, in resisting the doing, by him, of an unlawful act, the law will, to some extent, throw the mantle of charity over the necessary slaughter committed by me, by reducing my offense from murder to manslaughter. It amounts to a legal imputation of heat of blood for my benefit, whether in point of fact the jury should believe that there was such heat or not.

"The party slaying, however, cannot take shelter under it if the jury should be of opinion that there was actual malice. The killing must have occurred bona fide in the resistance to the unlawful act, or immediately after its defeat, and must have grown out of the commission, or the attempt to commit the act, and not out of any previous ill will, nor any personal grudge then and there engendered."

I think the case at bar comes within the intent and purpose of section 1237, Code of 1906. It means that "a legal imputation of heat of blood" is to be indulged in

favor of the slayer, where it clearly appears that he did the killing while resisting the commission of the unlawful act, and that the unnecessary slaughter was not committed by him with previous malice or after a considerable time had elapsed between the commission of the unlawful act and the time when the fatal shot was fired. There was no interval of time here in which the slayer might reflect and cool, but the unfortunate killing was done while the unlawful act was actually being committed by the deceased. It was undoubtedly one and the same unlawful transaction from the time of the whipping until the time of the shooting, which was but a few minutes thereafter. There was no abandonment of the commission of the unlawful act by the deceased. If the appellant had been released after he was whipped, and any considerable time had elapsed, and he had then killed the deceased, the jury would be warranted in finding a verdict of murder because there would have been an interval of cooling time in which the malice aforethought could have been formed. But the killing here was done during the commission and continuance of the unlawful act of the deceased.

The statute, section 1237, Code of 1906 (section 967, Hemingway's Code), necessarily implies an intentional killing, otherwise it means nothing; a purposed but unnecessary killing, a killing which but for the statute would be murder; and, since malice is a necessary ingredient of murder, to hold that if the homicide was malicious the statute does not apply would be to leave no field for its operation. If the killing was without malice, it would not be murder, and the statute would not be needed; if the existence of malice excludes its operation, it is repealed by construction. True, one cannot take refuge behind its provisions to wreak a personal pre-existing malice; nor lie in wait, as in the Brown Case, to execute a formed purpose to kill. But when, as here, it is

12—122 Miss.

manifest that the intention to kill was formed because of the criminal act of the deceased in repelling that act the offense, which but for the statute would be murder, is by its plain meaning reduced to manslaughter. Malice is not predicable under the facts of the case before us. *Beasley* v. *State,* 64 Miss. 522, 8 So. 234; *State* v. *Hill,* 20 N. C. 629, 34 Am. Dec. 396; *Cryer* v. *State,* 71 Miss. 467, 14 So. 261, 42 Am. St. Rep. 473; *Ayers* v. *State,* 60 Miss. 709.

A close examination of the authorities will disclose that this opinion is not in conflict with the rule as laid down in any of the cases.

I shall not take the time to discuss the distinction between the holding in the case at bar and the decisions cited as supporting the contrary view; but I may call attention to what must be obvious, that in the *Brown Case,* 98 Miss. 786, 54 So. 305, 34 L. R. A. (N. S.) 811, from the facts there shown, clearly a previous malice or prior premeditated design existed on the part of the slayer, who had not only threatened to commit the homicide, but who had armed himself with a deadly weapon and lay in ambush for the purpose of doing the killing. This Brown Case seems to hold also (which by the way was a decision of the question of murder or manslaughter not in the appeal because the jury had acquitted of the murder and found the appellant guilty of manslaughter) that: ''Malice essential to a conviction of murder may be ascertained from previous threats and measures taken in preparation, and, too, may arise suddenly and be implied from circumstances as from the intentional use at the outset of a deadly weapon.''

But when the Brown Case is read and digested, it plainly appears that there was proof in the case that the malice aforethought was formed long previous to the time of the killing and some time before the deceased was in the commission of the unlawful act, and that the malice may have been implied as existing prior to the fatal shoot-

ing, that is, that the malice aforethought could have arisen under the facts there immediately before the shooting took place.  But it will be observed that in the *Brown Case* and in the *Long Case,* 52 Miss. 23, and the other cases cited, there was an interval of time, either before the commission of the unlawful act by the deceased or immediately thereafter, in which the slayer had sufficient cooling time, or was already cool, to deliberately design and execute the killing with malice aforethought; but in the instant case the facts are essentially different, in this, that from the time the unlawful assault of the slayer was commenced and continued by the deceased until the time of the fatal shot, the slayer, having had no previous ill will or malice against the deceased, did not have any interval of considerable time in which to form premeditation and malice against the deceased before the shooting took place; it being one continuous unlawful transaction. Therefore we may say that it appears conclusively to us that under the facts of the instant case, the conviction, either under section 1237, Code of 1906, section 967, Hemingway's Code, or the common law and statutes on manslaughter, could have been for no more than manslaughter, as a matter of fact and law.  *Beasley* v. *State,* 64 Miss. 518, 8 So. 234; *Kelly* v. *State,* 68 Miss. 344, 8 So. 745; *Long* v. *State,* 52 Miss. 40.

STEVENS and ETHRIDGE, JJ., concur in the above opinion.

### ON SUGGESTION OF ERROR.

COOK, J.  A re-examination of the law of this case has convinced me that I was in error when I voted to affirm the judgment of the trial court, sentencing appellant to death.  It is now my opinion that the facts did not warrant a conviction of murder.  Section 1237, Code of 1906, was designed to meet just such cases as is made by the record before us.

It follows that I concur in the opinion written by Judge HOLDEN. Nothing I could say would add anything to his thorough and able discussion of the law and facts.

The judgment of the trial court will be reversed, and the cause remanded for a retrial in accordance with the principles announced in the aforementioned opinion.

*Reversed and remanded.*

ETHRIDGE, HOLDEN, and STEVENS, JJ., concur.

SYKES and SMITH, JJ., dissent.