CUTRER *v.* STATE.

In Banc. Dec. 12, 1949

No. 37244 (43 So. (2d) 385)

Hugh V. Wall, S. R. King, and Jackson, Young, Daniel & Mitchell, for appellant.

George H. Ethridge, Assistant Attorney General, for appellee.

Hall, J.

The appellant was convicted of the murder of Dan Dawes and, the jury being unable to agree upon his punishment, he was sentenced to the penitentiary for life. One of the contentions of appellant upon appeal is that the trial court erred in submitting to the jury the question of his guilt of murder because under the record here he could not have been guilty of anything more than manslaughter. A consideration of this question requires a statement of the facts disclosed by the record.

Appellant owned a mercantile business situated in a two-story building facing Highway No. 16 on the outskirts of the City of Canton. He and his wife lived upstairs over the store. Cessna Street intersected the

highway at right angles and ran by the side of the store. Behind the store Mrs. Cutrer owned a furnished residence which faced Cessna Street. She rented this residence to the deceased, Dan Dawes, on April 6, 1948, on a month to month basis, and the deceased and his family occupied it until June 5, 1948, the date of the killing. During this period of two months there had been some friction of a minor nature between the parties. Dawes was employed in drilling operations by an oil company. He was a strong and able-bodied man, about twenty-eight or thirty years of age, and weighed about one hundred and eighty to one hundred and ninety pounds. Cutrer was between sixty-five and sixty-six years of age, weighed one hundred and thirty-eight pounds, had only one eye, and was suffering with an intestinal ulcer. Mrs. Cutrer was between fifty-nine and sixty years of age; her weight is not shown by the record.

On June 5, 1948, Dawes telephoned to the store and advised that he was getting ready to move to another location and requested that Mr. Cutrer come over to his house and bring a receipt for the rent, and also bring his grocery bill as he was ready to pay them. Mr. Cutrer was unwilling to go over to the Dawes house as he feared that some trouble might be precipitated, and Mrs. Cutrer prepared a receipt for the rent and took it with the grocery bill over to Mr. Dawes. After she left, their daughter, Mrs. Edwards, who was assisting in the store, decided that the receipt as written might be construed as an advance payment of rent for a month after June 6th, instead of for the month from May 6th to June 6th, and she went over to the Dawes house to see that the receipt was properly drawn. Mr. Dawes paid the rent and the grocery bill and took the receipts therefor. He then requested a receipt for the rent which he had paid a month previously covering the period from April 6th to May 6th; Mrs. Cutrer told him that she did not have a receipt book with her but that if he would write the

receipt she would sign it, which was done. Dawes then asked her to look over the furnishings in the house and see if she had any further claim against him, and she did this and advised him that there was not enough damage to amount to anything and that she was satisfied. Up to this point the conversation had been pleasant and agreeable. Dawes thereupon ordered Mrs. Cutrer and Mrs. Edwards out of the house; according to their testimony Dawes thereupon stated to them "You have got your money, I have got my receipts, now get out of here or I will throw you out on your tails." One of the neighbors who was living in the next house up the street heard him say "Get out" and stamp his foot violently upon the floor. This neighbor corroborates Mrs. Edwards and Mrs. Cutrer in their testimony that Mr. Dawes violently pushed both of them out the front door, and it was shown that Mrs. Edwards had to catch a post to prevent falling from the porch to the ground. Mrs. Dawes admits that her husband put the women out of the house, but says that he caught each one by the arm and gently led them to the door.

In the meantime, Mr. Cutrer had heard the commotion and he got his pistol from the place where it was kept near his cash register, and placed it in his pocket, and went out the back door of the store and onto the driveway which belonged to the store and which lies between the store and the Dawes yard, and as his wife and daughter were getting off the porch, he called to them to come on back to the store. As Mrs. Cutrer reached about the bottom of the steps to the porch of the Dawes house, she turned and called Dawes a cowardly bastard. Mrs. Dawes ran out to attack her and Mrs. Edwards intervened, and Mrs. Dawes and Mrs. Edwards fought all the way across the yard and got down in a little ditch between the yard and street, about fifteen inches deep with sloping sides, with Mrs. Dawes at first on top. While they were fighting, pulling hair, and biting each

other, Mr. Dawes remained on the porch and Mrs. Cutrer remained in the yard, and Mr. Cutrer remained in the driveway; presently Mrs. Cutrer started toward her daughter and Mrs. Dawes. According to the State's evidence, Mrs. Cutrer picked up a board which was in the yard and Dawes ran out and took the board away from her, and then struck her such a violent blow in the face that splinters were broken from the board; her forehead was lacerated to the extent of requiring five sutures to close the wound; her glasses were broken in her face, her eyelid was cut, and she received numerous small cuts from the broken glass. According to the evidence for the appellant, Mrs. Cutrer did not pick up the board, but Dawes picked it up from the ground himself. However, it is not disputed that Dawes struck the blow just mentioned and inflicted the damage just detailed, and that he then caught hold of Mrs. Cutrer. According to the appellant's evidence he was choking her, but according to the State's evidence he was only holding her by the shoulders. At any rate, it is undisputed that Dawes was either holding or choking Mrs. Cutrer, and that blood was streaming down her face from the wounds which he had just inflicted upon her. The other two women were still fighting in the ditch, and according to appellant's evidence Mrs. Edwards had gotten on top, but according to the State's evidence Mrs. Dawes was still on top.

In the meantime, Mr. Cutrer had pulled the pistol from his pocket and several times ordered Dawes to turn Mrs. Cutrer loose, but instead of doing this Dawes turned her toward Cutrer so as to serve as a shield against Cutrer's pistol, and Cutrer finally told Dawes if he did not release Mrs. Cutrer he would shoot him loose. According to the State's evidence Dawes continued to hold Mrs. Cutrer by the shoulders, keeping her between himself and Cutrer, and according to the appellant's evidence Dawes was still choking her. Finally, Cutrer

started shooting and fired four shots in fairly close succession. The first two shots struck Mrs. Cutrer, one bullet merely cutting a groove across her forearm, and the other striking her about the collarbone and veering through her shoulder and lodging in her arm. The third shot struck Dawes in the leg and broke the bone, whereupon according to the State's evidence he released Mrs. Cutrer and fell to the ground with his face down, and Cutrer walked around behind him and placed his pistol down within two feet of his back and shot him the fourth time, but, according to the apellant's evidence, as well as that of one of the State witnesses, immediately after the third shot Dawes suddenly threw Mrs. Cutrer to one side and leaped at Mr. Cutrer in a fashion similar to a football flying tackle, at which moment Cutrer shot the fourth time, the bullet entering the back part of his shoulder and ranging downward at an angle of about forty-five degrees, Dawes' body coming to rest upon the ground with his arms extended forward and with his hands in fifteen inches to two feet of Cutrer. There were no powder burns on Dawes' clothing or body. He died in a very short time.

There were some other conflicts in the evidence on less material matters, but from all the evidence it is undisputed that immediately preceding the shooting Dawes had committed a serious and unnecessary assault and battery upon the person of Mrs. Cutrer, and still had hold of her body, either choking or holding her, when the shooting began and up until the moment of the last shot. Whether Mrs. Cutrer had first picked up the board in question is not important, for the reason that even under the proof offered by the State Mr. Dawes had succeeded in taking the board from her and disarming her, and neither Dawes nor his wife was in any further danger from the board when he struck Mrs. Cutrer with it. It is also undisputed that Mr. Dawes committed an assault upon Mrs. Cutrer and Mrs. Edwards inside the

house when he either pushed them out violently or gently caught them by the arm and led them out.

Reverting to the immediate time of the shooting, Mr. Dawes was clearly engaged in an unlawful act. Section 2225 of the Mississippi Code of 1942, provides: "Every person who shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter."

This section appeared in almost identically the same words in Chapter 64, Article 12, Title 3(II), of Hutchinson's Mississippi Code of 1848, and has been reenacted in every code of this State for the past century, and if the numerous Legislatures which have come and gone within that time had not been satisfied with the construction which this Court has placed upon the statute, there would unquestionably have been some change made in it as it came down through the years. Since no change has been made, it necessarily follows that the construction of the statute by this Court has met with legislative approval.

In the early case of Long v. State, 52 Miss. 23, this Court, composed of three men as able as ever graced the Bench of this State, speaking through Judge Chalmers, said:

"The 12th instruction asked by the defense, and refused, was based on Section 2638 of the Rev. Code, and is almost an exact transcript of it. That section declares that 'Every person who unnecessarily kills another, either while resisting an attempt by such other person to commit any felony, or to do any other unlawful act, or after such attempt shall have failed, shall be guilty of manslaughter.'

"Though this provision has been on our statute books for many years (Code 1857, p. 602) it has never undergone adjudication, so far as we can discover. It is borrowed from the Code of New York, where it is to be

found in the same words. 2 Rev. St. of N.Y., p. 661, Section 11. It seems to have come under review in that state in one case only, and that one throws no particular light upon it. Ruloff's case, 11 Abb. Prac., N.S., 245; s. c., 45 N. Y. 213.

"We confess ourselves much embarrassed to give it a proper construction. The language, literally taken, seems to mean that every killing will be manslaughter, however unnecessarily perpetrated, provided it was done while the party slain was engaged in an unlawful act, or after the attempt to do such unlawful act had failed and was abandoned. Thus construed, there is no limitation as to the time when the killing must take place, nor any limitation upon the nature of the unlawful act which the party slain had been engaged in attempting.

"In this broad sense it would declare as manslaughter the killing of a man who had been engaged the hour or the day before in an attempted trespass, which had failed. Such a construction would be aliter inconsistent with the cardinal principles of criminal law, and shocking to the moral sense.

"We must think that the 'unlawful act' spoken of means a crime or misdemeanor. The language is 'to commit a felony, or to do some other unlawful act.' The unlawful act, we think, must be of a criminal nature, even though inferior to felony. We think, further, that the killing must take place either during the actual resistance to the unlawful act, or immediately following its defeat and abandonment. If it occurred after the lapse of any considerable period, it would seem impossible to divest it of the element of malice. Thus construed, the statute amounts to this: If I see another engaged in the commission of an offense against the criminal laws and I resist its accomplishment, and in such resistance slay the person so engaged, my crime will be manslaughter and not murder, even though the act of killing was unnecessary to the defeat of his act;

and the same result will follow where the killing ensues instantly after the abandonment by him of his attempt. Because I was engaged, or had just been engaged, in resisting the doing, by him, of an unlawful act, the law will, to some extent, throw the mantle of charity over the necessary slaughter committed by me, by reducing my offense from murder to manslaughter. It amounts to a legal imputation of heat of blood for my benefit, whether in point of fact the jury should believe that there was such heat or not."

In Williams v. State, 122 Miss. 151, 84 So. 8, the Long case was cited with approval, and it was there held that under the facts shown the question was a matter of law for the court to pass upon and not a question of fact for the jury.

In Bergman v. State, 160 Miss. 65, 133 So. 208, 210, the Williams case was cited with approval, the construction previously given to the statute was followed, and the Court said "On the facts contained in the record in this case, we are of opinion that no greater conviction than manslaughter can be upheld."

In Walker v. State, 188 Miss. 177, 189 So. 804, the above cases were followed and the Court there held that the issue of manslaughter alone should have been submitted to the jury, and that a conviction of murder could not stand under the record there presented.

In Bangren v. State, 196 Miss. 887, 17 So. (2d) 599, the statute and prior interpretations thereof were again followed, and it was again held that the trial judge erred, upon the facts of that case, in not limiting the issue for the jury to the question of manslaughter or justifiable homicide.

In Shedd v. State, 203 Miss. 544, 33 So. (2d) 816, 818, the statute was quoted, the decisions in the Bergman and Walker cases were reviewed, and the Court held "On the proof in the record of this trial the Court should have

refused the State all instructions as to murder and malice aforethought.''

We have carefully reviewed all the evidence in the case at bar, and upon the record here presented we are of the opinion that under the foregoing authorities the trial court erred in submitting the question of murder to the jury, and that, at most, the appellant could not be convicted of anything more than manslaughter.

The judgment of the lower court is therefore reversed and the cause remanded.

Reversed and remanded.