## Owen *et al v.* State.

(In Banc.  Dec. 14, 1936.  Suggestion of Error Overruled, Jan. 11, 1937.)

[171 So. 345.  No. 32379.]

Hill Jarratt, **N. H. Malone**, and **J. E. Caradine**, all of West Point, for appellants.

**B. H. Loving,** of West Point, and **Webb M. Mize,** Assistant Attorney-General, for the state.

494

**Ethridge, J.,** delivered the opinion of the court.

The appellants were indicted, tried, and convicted of the murder of Herman Whatley, a human being. Herman Whatley was a bachelor who operated a store some five or six miles west of West Point, in Clay county, Miss., living and sleeping in the store.

On the night of the 27th of December, 1935, some time prior to twelve-thirty o'clock, Whatley was murdered, shot in the head and through the heart with a .22-caliber weapon. Upon a post mortem being held, the course of the bullet was traced through the heart, and found lodged against the spinal column.

About twelve-thirty that night three men had gone to the store for the purpose of getting some gasoline for their car. They called in front of the store, and knocked on the door, but received no answer. One of them perceived a light burning in the rear of the store, and, peeping through the door, discovered that the house, or something within it, was on fire. They broke the door in, and found the cot, upon which the deceased usually slept, burning, and the floor sprinkled with kerosene. They tried to extinguish the fire, moved the cot outside, and got a keg of water from under the house, but found it frozen, the night being cold, with sleet falling. They then thought they would get some water from a refrigerator in the store building, lighted the lamp and went into that part of the building, where they found Mr. Whatley upon the floor near the door, dead. A quilt had been put over the door in the front of the building, and some rags had been used to chink the bottom of the door, to prevent the light from showing from the front. The parties who made this discovery sent one of their number for the brother of the deceased, who lived some little distance from the store, although in the neighborhood. Upon arriving at the store, the brother sent for a doctor, who made an examination of the body and the premises. The physician said that in his opinion Mr. Whatley had been dead for something like an hour—possibly a little longer. On the outside of the store was a gasoline tank, from which the deceased had sold gasoline, and near this was found some blood, and signs of the body having been dragged from this point to the inside of the store. Inside they found that the purse of the deceased, or rather two purses had been rifled or tampered with, one purse being near the body, and one near the cash drawer. They also found cans from which some one had eaten sardines and potted ham. The sheriff was sent for, who notified the fire marshal of the state insurance department. And the fire marshal came to

the place of the crime for the purpose of investigating the fire, it being his duty under the law to investigate fires of alleged incendiary origin. He and the special deputy sheriff, Franks, proceeded to investigate and learn what they could of the tragedy and the origin of the fire. They learned that two young men had been to the store about ten o'clock that night, and bought Coca-Cola to be used as a "chaser" for whisky which they had bought in West Point, and some of which they drank at the store; drank some of the Coca-Cola there, and bought three more bottles. At the time the men were at the store appellants were both there. The two men proceeded to a dance at a place some little distance from the store building, leaving appellants in the store.

So far as the testimony shows, no one was at the store from the time those men left until the discovery of the body, with the exception of the appellants. Mr. Franks, special deputy sheriff, and Mr. McDonald, state fire marshal, suspected the appellants, and they were arrested for questioning. The appellant Phillips denied having been at the store at all that night; the appellant Owens admitted that they had been to the store that night. Owens was taken to where Phillips was held; and while Phillips was being questioned and again denied being at the store the night of the killing, the deputy sheriff slapped him and accused him of lying, whereupon Phillips admitted that he had been to the store that night with Owens; but both denied any connection with the killing, or any knowledge of it. They were carried to the jail at West Point and placed in separate cells, to prevent their communicating with each other.

On the following day Mr. McDonald went to the jail, to the cell where Phillips was confined; and the latter stated to him, so McDonald testified, that he had sat up the night before hoping that Mr. McDonald would come, as he desired to talk with him and make a statement about the matter. According to Mr. McDonald's tes-

timony no one was present, and no threats were made to secure the statement, and no hope or promise of reward or assistance was given to Phillips—on the contrary, he was informed of his constitutional right not to talk; after being so informed, Phillips proceeded to make a statement to the effect that he and Owens went to the store, he having a quarter and Owens a nickel, and first called for cheese, but Mr. Whatley had none, so Owens bought some sardines and Phillips some potted ham, which they ate in the store. While they were there the two young men came in and bought Coca-Cola and drank whisky, and after they left Phillips stated that he and Owens started to leave, when Mr. Whatley requested them to bring him in some wood. They then went away, and Owens said to him, "Suppose we do some devilment," and on Phillips replying, "All right, what will we do," Owens said, "Kill Mr. Whatley." He said that Owens had something in his pocket wrapped in something white, which Phillips thought was a pistol, though he did not then see it. They went back to the store and called Mr. Whatley out, and Owens asked him, "What about crediting me for four or five boxes of sardines." Mr. Whatley stated to Owens that he "wouldn't credit him for a damned thing;" whereupon Owens said, "I owe you six cents for some tobacco, and I won't pay you a damned thing." Mr. Whatley said, "I won't take that," and Owens said, "You won't take that?" and shot him twice. Mr. Whatley fell, and Owens dragged him into the store and covered the door with the quilt to keep the light from showing, and chinked the bottom of the door with some cloth obtained from the rear of the building. He and Owens then went into the cash drawer, but found no money in it. Owens then went into Mr. Whatley's pockets and secured two one dollar bills and some change amounting to three dollars, and took the purse from his pocket, leaving it near him, and the other purse near the cash drawer. Thereafter

they ate some more canned goods, went into the back room and poured kerosene on the cot and floor, and set it on fire. About that time they heard somebody come up, and ran out the back door, Phillips going across the road into some brush and behind some trees. There were three men in the automobile; one went to the door, called, got no answer, and they then went to the rear of the store, broke into it. Phillips thereupon left. He also stated that after this he and Owens met again, and Owens offered him part of the money, which he declined to take. Subsequently he met Owens, and asked him what he did with his, Phillips' knife, which Owens had, and Owens replied that it was in safe-keeping. He then asked Owens what he did with the pistol, and Owens said that it was in safe-keeping.

Subsequent to this confession by Phillips, Mr. Franks, the deputy sheriff, was called, and Phillips repeated the confession in his presence. Franks and McDonald then sent for Mr. Critz, county attorney, who came to the jail, and the confession was repeated to him in the presence of Mr. McDonald and Mr. Franks. Mr. Critz then brought his stenographer, and also one regular deputy sheriff and another person, and Joe Phillips repeated the confession to these parties, the stenographer taking it in writing. All of these witnesses testified that the several statements were free and voluntary, and that the statement so taken down was read back from the stenographer's notes to Joe Phillips, and admitted by him to be a correct report of what he said. Owens was sent for, questioned, and told that Phillips had confessed; but Owens denied the statement made by Phillips, and stated that Phillips was lying. Owens and Phillips were carried by the authorities from the West Point jail to the jail at Tupelo, and there placed in separate cells. Subsequently Owens confessed to several parties, which confessions were shown by them to be free and voluntary, and in which he admitted substan-

tially what Phillips had stated about the matter at West Point. After the confession by Owens, he and Phillips were carried to the courthouse, to the room of the sheriff, and there Owens' statement was taken down in type-writing, signed by him, and witnessed by several parties. Phillips was present, as testified by these parties, and then and there admitted that the statement made by Owens was correct. Phillips made a supplementary statement, which was also taken down in writing on a typewriter, admitting the killing of Mr. Whatley substantially under the circumstances detailed by Phillips at West Point. At the preliminary hearing as to the admissibility of the confessions, before the circuit court, the defendants, testifying before the court, claimed that they had been coerced into making the confessions; that they had been told that if they would confess they would not be hung for the crime; and also some statements were made to them in regard to the likelihood of a mob forming, and that they were carried to Tupelo to a safer jail.

The circuit court devoted some five or five and a half hours to taking the testimony preliminary to admitting the confessions, this in the absence of the jury; and then ruled that the statement made by Phillips at the time of his arrest, when he was slapped by Franks, was inadmissible; but that the other confessions were shown by the overwhelming weight of the evidence by disinterested witnesses to have been free and voluntary; and that while the statement made by Phillips to Franks and McDonald when first questioned, and when he was slapped, would not be admitted for the state, yet if the defendants wanted to admit it before the jury they would be allowed to do so. Further statements will be made relative to the confessions later in this opinion.

While the jury was being impaneled, and the court was interrogating the jurors, and after several jurors had been questioned and placed in the panel, the court made some statement, or asked some question of a prospective

juror named Blankenship; among other things, as to whether he, Blankenship, would render a white man's verdict; to which statement or question defendants excepted, and moved to quash the entire panel and the special venire submitted for this week, giving as grounds for this motion, "that upon the preliminary examination of a proposed juror, A. D. Blankenship, the court asked the juror, or proposed juror, among other things if he would render a white man's verdict, such remark operating to the prejudice of the defendants as to the proposed juror and other jurors accepted by the state and the defendants and jurors which had not been presented by peremptory challenges and the remaining members of the panel which had not previously been exhausted, such action resulting in the impossibility of the defendants to get a fair and impartial trial as accorded to them by the laws of the State of Mississippi and the Constitution of the State of Mississippi, and the Constitution of the United States, and being calculated to cause such prejudice on the part of said jurors."

The voir dire examination of the jurors was not placed in the record, but the court made a lengthy statement in overruling the motion, saying, among other things: "This juror, Blankenship, was examined fully by the court about his qualifications. He was asked if he would give to these two negro defendants an absolutely fair, just and honest consideration and decision of this case regardless of their race and color, to which Blankenship answered that he would. As a matter of fact, that same inquiry has been made by the court and also by counsel for defendants of each juror who has been called into the jury box today, either from the special venire or from the two regular juries for this week, and by repeated inquiries it has been impressed upon these prospective jurors that these two defendants, regardless of their race and color, should be and must be given an absolutely fair, honest and just trial. . . . By that

question their attention was simply called to their duty and obligation as white men trying negro defendants to give them the same fair, just and impartial trial that they would give to a white man on the law and testimony. . . .

"Q. (By counsel for the State) Refresh your mind as to just exactly the language used with reference to the remark completed. Over there after that, state whether or not the exact language was this: 'A white man's verdict, this is a righteous verdict? A. The Court: Yes, sir, I think that is the expression I used, 'An honest verdict, a white man's verdict in this case and a righteous verdict.' "

The court also stated that he used the same expression all over his district, in cases where white men were on trial, simply emphasizing the fact that a white man must, in serving on the jury, render a fair and honest verdict. "There was no allusion to the color of the defendants, but merely that all jurors were white citizens of Clay County, and throughout all examinations, both of special venire and regular panels, by repeated and constant inquiries I have emphasized that they should and must give to these two negro defendants an absolutely fair and honest trial, regardless of race and color." The judge also stated that in the absence of the jury he had offered to instruct the jury on their return to the courtroom that the said inquiry or question was not intended as a reference to the race and color of the defendants, or to discriminate against them, but was addressed to Blankenship, as a white citizen of Clay county, in order to be sure that, if accepted for service on the jury, he would give the defendants an absolutely fair trial; to which offer one of the defendants' attorneys responded that such an instruction would merely tend to emphasize the inquiry, and the court, therefore, did not make such explanation to the jury.

It will be seen from the statement by the judge when the offer was made that he was merely searching the

jurors' minds and consciences as to whether they would give the defendants, who were negroes, a fair and impartial consideration and verdict to the same extent and under the same conditions as though they were white men being tried for the same offense on the same evidence. One of the definitions of a "white man" given by Webster in his New International Dictionary is, used colloquially, "a trustworthy, fair-dealing person." It is manifest that the circuit judge was using the language in the colloquial sense. Taken in the light of the full and complete examination of the jurors, as disclosed by the statement of the trial judge, which is not disputed, and must be accepted (Gurley v. State, 101 Miss. 190, 57 So. 565; Turner v. State, 121 Miss. 68, 83 So. 404), it is not reversible error in this case. However, we do not approve the use of this expression in cases where negroes are parties to the suit being tried, especially where they are being tried for an offense against a white person, and especially in a capital case, and were it not for the full explanation and the examination of the jurors in which they were required to testify that they would give a negro the same fair, just, and impartial consideration that would be accorded any other person, and that their verdict must be an honest and upright verdict, regardless of race or color, we would reverse the case. This court has been particularly strict in requiring fair trials to all, regardless of race, color, creed, or condition. In Ezra Hampton v. State, 88 Miss. 257, 40 So. 545, 546, 117 Am. St. Rep. 740, involving an appeal by the prosecuting attorney to race prejudice, the language used being set forth in the opinion, the court wound up its opinion as follows: "Mulattoes, negroes, Malays, whites, millionaires, paupers, princes, and kings, in the courts of Mississippi, are on precisely the same exactly equal footing. All must be tried on facts, and not on abuse. Only impartial trials can pass the Red Sea of this court without drowning. Trials are to vin-

dicate innocence or ascertain guilt, and are not to be vehicles for denunciation.''

In Gore v. State, 155 Miss. 306, 124 So. 361, in which complaint was made concerning reference to race in the trial, the court said, on page 308 of 155 Miss., 124 So. 361, 362: ''That no man shall be convicted upon an appeal to the race issue is a firm and settled proposition in this court. And it is no new proposition for the first time announced and upheld here in any recent case. It has been, in words as clear as human language could make it, pronounced and reaffirmed here for more than a generation, and will continue so to be, as we have no doubt, so long as good government shall be an abiding passion among that vast majority which constitutes the better class of our people. That vast majority expects it, moreover, they demand it; and there is and has been no occasion in the direction of the slightest surprise in the announcement of any new decision that the matter should continue to be looked upon in this court as it so long has been, and as we repeat will, without shadow of turning, always be.''

This latter decision was rendered at the September, 1929, term of the court, and between these two cases, covering approximately a quarter of a century, we have repeatedly reiterated the principles therein announced; and attorneys and judges should be careful not to infringe upon these principles. See Collins v. State, 100 Miss. 435, 56 So. 527; Morley v. State, 112 Miss. 854, 73 So. 791; Williams v. State, 121 Miss. 433, 84 So. 8; Id., 122 Miss. 151, 84 So. 8; Garner v. State, 120 Miss. 744, 83 So. 83; Funches v. State, 125 Miss. 140, 87 So. 487; Story v. State, 133 Miss. 476, 97 So. 806; Hughey v. State (Miss.), 106 So. 361; Walton v. State, 147 Miss. 17, 112 So. 601; Sykes v. State, 89 Miss. 766, 42 So. 875; Harris v. State, 96 Miss. 379, 50 So. 626; Hardaway v. State, 99 Miss. 223, 54 So. 833, Ann. Cas. 1913D, 1166.

On examination of two of the jurors it was shown that they were related to the two witnesses, Gates and Ste-

phens, who had gone to the store the night of the killing, and who saw the appellants there. Although related to the two witnesses, these jurors stated that they had not talked to the witnesses, and did not know what their testimony would be, and that they would treat such testimony as they would that of any other witness, and would feel no embarrassment in deciding the case on its merits. We do not think the relationship disqualified the jurors, and there is no merit in this contention.

In addition to what we have already stated in regard to the confessions made on several different occasions, there is a statement by the jailer at Tupelo, Miss., who had charge of the appellants for some time, to the effect that on Saturday afternoon, the 10th of January, when passing the cell of George Owens, the latter said to him, "I am going to tell the truth next time these men come back here. I believe if I would tell the truth I would feel better, but I have been lying about it. I want to tell the truth."

After George Owens had confessed to the officers, subsequent to this statement, and after the appellants had been returned to the jail, having made the signed statement in the sheriff's office at the courthouse, the jailer testified that after he put them back in the cage, and started to walk away, George Owens said, "Mr. Luther, I feel lots better, but I hate to bother you, but I have been feeling like they was going to hang me ever since they brought me up here. I have been trying to get ready. I have been trying to pray. Something has been telling me all the time I could not get forgiveness telling lies for this other. That is why I want to tell the truth. I have told it. I feel lots better. I feel like I can get forgiveness for that awful crime."

The jailer also testified that subsequent to this, on numerous occasions, the prisoners talked about the crime to him and to the other prisoners; and that Owens never, during the time he was confined in the Tupelo jail, de-

nied the truth of his confession or retracted it; but that subsequent to the confessions Joe Phillips denied the facts given in his confession. The prisoners were confined in the jail at Tupelo from early in January until a few days before the April term of the circuit court in Clay county, at which time they were removed from Tupelo back to West Point, for trial. After the court had admitted the confessions, as before stated, the witnesses John Franks and J. D. McDonald were introduced, to testify to facts and circumstances which were disclosed in their investigation, and before the arrest of the appellants, and which led to the arrest. On cross-examination of each of these witnesses, the defendants developed through them the fact that Franks slapped Joe Phillips because he had lied to him, and the circumstances leading up to the striking, but did not develop the statement then made by Joe Phillips. After the cross-examination, the district attorney developed the statement made after the slapping, over the objection of the appellant, the court ruling that it was admissible because developed by the defendants, and that they would have to take the bitter with the sweet. We think this statement should not have been admitted. The defendant had the right to develop the circumstances, including the fact that the defendant Phillips had been slapped, as tending to show coercion, or circumstances from which fear could be inferred; and this development of these facts did not warrant the admission of the statement which had been first secured from Phillips, that he went to the store. But in this case it is harmless error, for the reason that the state, on the preliminary hearing before the judge, had developed numerous free and voluntary confessions, the ruling that they were free and voluntary being sustained by the overwhelming weight of the evidence, and these subsequent confessions, freely made, contain the same statements, among others more damaging, as were made at

the time Mr. Franks slapped Joe Phillips. Consequently the case cannot be reversed for this error.

The defense of the defendants was an alibi, to prove by members of their respective families, with whom they lived, that they were at home at the time the crime must have been committed, and that they remained at home during the night; the testimony being such, if believed by the jury, as to show that they were not at the scene of the killing. But there was in the confessions a detailed account, showing that they were present, and committed the crime. And, in addition to this contradiction, they were contradicted by the witnesses Gates and Stephens, who were at the store subsequent to the time when the appellants claimed to have returned to their homes. They were at the scene of the killing at ten o'clock that night, and the testimony on their behalf was to the effect that they returned home, each to the place where he lived, prior to ten o'clock. The jury were warranted in accepting the confessions as true; all the physical facts developed are in harmony with the facts as related in the confessions. Owens stated in his confession that he had thrown the knife and pistol in Walker's Lake; that he had found the pistol at a lumbermen's camp, they having left the pistol when they moved away. The evidence was sufficient, and we find no reversible error in the rulings upon the evidence, although some of them were erroneous, and under a different state of facts might have constituted reversible error.

It is assigned for error that the verdict was contrary to the law and the testimony, but from the statement already made it appears that there is no merit in this assignment.

After the conviction of the appellants in the circuit court, and the adjournment thereof, the defendants, through their attorneys, filed with the circuit judge a petition for a writ of coram nobis, in which it was alleged

that one of the jurors, O. C. Brown, was related to the deceased by marriage; that he had concealed this fact on his voir dire examination, and for this reason neither the appellants nor their attorneys knew of this fact at the time of the trial. This petition was verified by each of the appellants and by each of their attorneys.

It appears from the examination of the juror Brown that he did not know the facts relied upon to constitute relationship to the deceased by affinity. It also appears from the testimony that there was, in fact, no relationship by affinity. The wife of the juror Brown had certain relations who had married relatives of Herman Whatley, the deceased; but these relationships were beyond the rule of law as to what constitutes relationship by affinity. The juror Brown was related to blood relatives of his wife; but he was not related to the blood relatives of the in-laws of his wife's relatives. The rule of relationship has been well stated in a couplet often quoted;

"The bride and groom each come within the circle of the other's kin.

"But kin and kin are no more related than they were before."

In other words, a man who marries a woman is related by affinity to her kin by consanguinity, or blood, but the relationship stops with the husband or wife of the person related by affinity, and does not extend to the blood relatives of such in-laws.

When this petition was being heard, the circuit judge asked each of the counsel for the appellants what the relationship was which they counted on to disqualify Brown, and they stated that they could not answer that, but they presented the facts to the judge for his determination; and he held that whatever it might be, it was not sufficient to disqualify the juror Brown; and, further, that Brown, being in ignorance of this relationship at the time of the trial, could not have been influenced

thereby. The judge denied the writ of coram nobis to set aside the verdict of the jury, and dismissed the petition, and we are of the opinion that he did not err in so doing.

We find no reversible error in the record. The judgment is affirmed, and Wednesday, the 20th day of January, 1937, is fixed for the date of the execution.

Affirmed.