CITY OF LAUREL *v.* HUTTO.

March 8, 1954

No. 39115          56 Adv. S. 4          70 So. 2d 605

*Andrew S. Scott, Welch, Gibbes & Butts,* Laurel, for appellant.

*Hester & Walker*, Laurel, for appellee.

LEE, J.

This is an appeal by the City of Laurel from a judgment of the Circuit Court of Jones County, which, on the verdict of the jury, awarded Miss Beatrice Hutto the sum of $10,000 for personal injuries.

Miss Hutto's declaration, in effect, alleged that on July 16, 1951, while she was walking along a pathway in the City's Daphne Park, in a careful and observant man-

·ner, she stepped in a hole, broke her leg, and sustained a serious injury; that the City knew, or by the exercise of reasonable care ought to have known, about the hole, because it had existed for a long time; that the City also knew, or by the exercise of reasonable care ought to have known, that the pathway was commonly used by the public both day and night; and that her injury proximately resulted from the failure of the City to exercise reasonable care to keep the pathway in a reasonably safe condition.

The City, by its answer, denied all material allegations of the declaration. It denied that there was a hole in the pathway and that the plaintiff received her injury in that manner. It alleged that a bridge over a ditch along this pathway was built for the purpose of enabling its employees to move their mowing machines across the ditch, and that the public was not invited to use the same. It also raised, as a defense in law, that, in the operation of its park, the City acted in a governmental capacity and not in its private or corporate capacity, and, for that reason, it was not liable.

The defense of immunity will be dealt with first.

It is true that in the case of Jones v. City of Amory, 184 Miss. 161, 185 So. 237, this Court observed that: "In the establishment and regulation of schools, hospitals, poorhouses, fire departments, police departments, jails, workhouses, and the construction of buildings for those purposes, municipalities act in their governmental, and not their private, capacity." The authorities, which sustain the above principles as the fixed law of this State, were collected and enumerated in the opinion.

But, in City of Pass Christian v. Fernandez, 100 Miss. 76, 56 So. 329, it was held that the operation by the city of a trash or garbage cart is a private or corporate purpose and not a governmental function.

This Court has repeatedly held that a city is liable for failure to exercise reasonable care to keep its

streets reasonably safe for use by persons exercising reasonable care. See authorities in Byrnes v. City of Jackson, 140 Miss. 656, 105 So. 861. See also City of Greenville v. Laury, 172 Miss. 118, 159 So. 121; City of Hazlehurst v. Matthews, 180 Miss. 42, 176 So. 384; Ming v. City of Jackson, 202 Miss. 260, 31 So. 2d 900.

Besides, in Byrnes v. City of Jackson, supra, it was expressly held that " * * * ██ the rule making it the duty of the city to exercise reasonable care to make its parks reasonably safe places for people to resort to, and making the city liable for negligence, is the better rule." In that case a bear in the zoo in Livingston Park had bitten and injured Mrs. Byrnes. It was there contended by the City that the zoo was a part of the education of the public, and therefore its operation was a governmental function. The Court rejected that contention by observing that "it is not such an education as the city is required by law to furnish to the public." The distinction was made that the right was permissive rather than mandatory.

In City of Columbia v. Wilks, 166 So. 925 (Miss.) where Mrs. Wilks fell through a hole in a walkway, maintained by the city as an adjunct of its swimming pool, the city made the same contention, namely, that, in maintaining the swimming pool and walk in the park, it was engaged in a governmental, not a private corporate, function. But that contention was again rejected, and the Court adhered to the rule laid down in Byrnes v. City of Jackson, supra. See also City of Jackson v. McFadden, 177 So. 755 (Miss.).

██ The principle in the Byrnes case and in the Wilks case, supra, is decisive against the City's contention here; and it is so well settled that we decline to overrule or modify it.

In the further consideration of this case, three questions are posed: (1) Did Miss Hutto fall in a hole in the pathway near a small bridge in the park? (2) Did the

City have notice of the hole? (3) Did the City permit the general public to use the pathway and bridge?

In brief, the evidence was as follows: Miss Hutto and Miss Reatha Little lived in an apartment just east of Daphne Park. About 8 o'clock in the evening of July 16, 1951, they were walking from their home across a part of the park to the swimming pool to attend a water carnival. They followed the course which they had pursued on many previous occasions, that is, a well defined pathway which led over a bridge across a small ravine. They could see the pathway and bridge. They did not see a hole, as no lights were nearby. In immediate proximity to the bridge, Miss Hutto's left foot and leg went into and down a hole about 14 inches in diameter and a foot deep. As a result, her ankle was dislocated and both bones of the leg were broken. Miss Little succeeded in getting her companion back to the apartment where she called a doctor, who came in a short time and sent her to the hospital. About noon the next day Miss Little went to the scene in order to get a shoe that pulled off Miss Hutto's foot and became lost when she stepped in the hole. She found it on the bridge. One of the negro workmen, at the place, informed her that he had taken it out of the ditch. At the time, Miss Little looked under the bridge and found that the hole had been washed out from below. The ground was chopped up, and the hole had been filled with clods and dirt. There was no water in the ditch, and there had been no rain for sometime.

For four years Miss Hutto had used the pathway and bridge with different people. She had taken children to the park and swimming pool by that route, and had seen other people using it in crossing the park on Sundays and in the afternoons. Both she and Miss Little used the pathway in the daytime and at night. According to John Howard Flowers, Jr., there had been a bridge at that point since 1939. He testified to its general use by the public for a number of years. He had used it a few times

shortly before Miss Hutto's accident. At times, E. D. Hurst used it himself, and saw it used extensively. He also said that the weather was hot and dry at the time.

Commissioner Smiley testified that it was his duty to make investigations of pathways in the park. He crossed the bridge often, every week or ten days; and if there had been any defect, he thought that he would have found it. The bridge was built out of crossties as a convenience for his workmen. His men, if they found a defect, either reported to him or went ahead and fixed it. In his opinion, anybody, who wished to cross the ditch, would use the bridge. There were no warning signs which forbade its use. He did not notice a pathway. His men were working around the bridge the day before the accident. He admitted that a person, going across the park from a point opposite Miss Hutto's apartment to the swimming pool, would be in close proximity to the bridge.

John Jennings, an employee of the City, never noticed a pathway. Kearney Walker, a park employee, testified that he was in and about the bridge at least every ten days during the mowing season. He was at the place around noon on the 16th. The rest of his crew were mowing that day in order that it would be safe for the people to go through the park that night. There was no well-defined pathway—there was no hole—and nobody filled one up the next day. Jim Moore, another employee, took the shoe out of the ditch the morning after and gave it to Miss Little when she inquired about it, and told him that her friend got hurt there the night before. He denied however that she got in the ditch and looked. He also said that there was no hole in the pathway and that nobody filled a hole.

Thus, on the first question, Miss Hutto was corroborated by Miss Little as to her fall in the hole near the ditch. The lost shoe was found in the ditch the next morning by a city employee, and was given to Miss Little when she was in search of it. She looked under the

bridge, determined that the hole was washed out from underneath, that it was about 14 inches in diameter and a foot deep, and that it had been filled up that morning. In dispute of the plaintiff's evidence on this point, the city's evidence was to the effect that there was no pathway, there was no hole, and nobody filled one up.

On the second question, the evidence for the plaintiff showed that the hole washed out from underneath, there was no water in the ditch, and it had not rained in a considerable period of time. The hole was 14 inches in diameter and a foot deep. The City employees often viewed the place, and worked about it on the day of the injury. The hole had been filled the day after. The logical inference was that the employees of the City must have seen it. In dispute of this, the City's evidence showed that there was no hole at the place in question. And if it had been, the employees would have found it, and would have either fixed it or reported it.

On the third question, there was no real dispute that anyone, who wished to do so, might use the bridge, even though the City built it for the convenience of its employees. Besides, there was no sign or warning of any kind which forbade or limited its use.

The question as to whether or not Miss Hutto's injury resulted from her fall in the hole was in sharp dispute, and the determination thereof was for the jury. Since the jury found that the hole existed, the proof was abundant to show that the City knew about it, because of its existence for a considerable period of time, and that the pathway in the past had been, and was then being, used by the public. Thus the verdict of the jury can not be said to be against the great weight of the evidence. Consequently, the motions by the City both for a directed verdict and for a new trial on the ground that the verdict was against the great weight of the evidence, were properly overruled.

■■■ Appellant criticizes several instructions which were given for the plaintiff. We notice instruction No. 5 because it is said that such instruction made the City an insurer. It was erroneous as to the degree of care when it said "then the law makes it the duty of the defendant, City of Laurel, to keep the same (pathway) in a reasonable safe condition * * *." It omitted to say that the law makes it the duty of the defendant, City of Laurel, *to exercise reasonable care* to keep the same in a reasonably safe condition. But the correct principle was announced in plaintiff's instructions Nos. 1, 6, 7 and 10. Besides, defense instruction No. 8 informed the jury that the only duty of the City was "to use ordinary care to see that the facilities may be used without harm by persons using ordinary care." When all of the instructions are considered together, we do not deem the omission sufficient error to reverse the cause.

■■■ Appellant argues that the trial court committed error in refusing certain instructions which it requested. Instructions Nos. 2 and 5 were properly refused because they exonerated the City, if the walkway had been theretofore "abandoned." ■■■ Number 6 required a verdict for it, unless the jury believed that the pathway was placed there by the City. There was no proof of that fact, and besides, the proof showed that it was generally used at least with the acquiescence of the City. However, since the given instructions for the parties, when considered together, fully and fairly presented the legal principles which were applicable to the real issues of this case, the refusal of these and other requested instructions was harmless, even though they, or some of them, might, with propriety, have been given.

■■■ With reference to the contention that the verdict is excessive, this should be said with reference to the proof in regard to the injury: The plaintiff was 27 years of age and was earning $45 per week at the time. She testified on the trial in February 1953 that she was able to

do only 25% of her former work. She lost 19 weeks from work. She was in the hospital for two weeks and had to return on two other occasions. Her medical and hospital expenses approximated $328. The ankle was dislocated and both bones were broken about two inches above the ankle. Permanent scars from the operation are visible. Her attending physician, Dr. Earl McRea, testified that she had a bad injury, that she suffered severe pain, and that there are several possible complications. Six pictures of her ankle and leg made between November 12, 1952, and January 14, 1953, depicted the enlarged condition of the ankle and leg at those times. She testified that the ankle swells when she tries to walk. There is no rational basis on which this Court can say that the jury's award of $10,000 is excessive, or that it evinces passion or prejudice.

▉▉ In appellant's supplement to its motion for a new trial, it was assigned that Juror Jim Pearson was related to the complainant, and that he denied, on his voir dire examination, that he was related.

The proof did not conform to the allegation. The juror testified that he had never seen or known the plaintiff until the trial. The court was warranted in believing that he, in no way, failed to make any disclosures concerning matters about which he was questioned. ▉▉ Besides, the juror's nephew by blood married a woman, who is an aunt by blood of the plaintiff. While the juror is related to his nephew's wife by affinity he is not related to her relatives. Owens v. State, 177 Miss. 488, 171 So. 345.

It therefore follows that this cause should be, and is, affirmed.

Affirmed.

*Roberds, P. J.*, and *Hall, Kyle* and *Gillespie, JJ.*, concur.